IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 12, 2016 Session

## STATE OF TENNESSEE v. JOSE LEMANUEL HALL, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1736     J. Randall Wyatt, Jr., Judge**

_____

**No. M2015-00018-CCA-R3-CD – Filed March 29, 2016**
_____

Defendant, Jose Lemanuel Hall, Jr., was convicted of first degree murder and sentenced to life in prison.  On appeal, he argues (1) that the evidence was insufficient to support his conviction; (2) that the trial court erred in admitting evidence regarding his gang affiliation and gang rank; (3) that the trial court erred in admitting photographs; and (4) that the trial court erred by ordering consecutive sentencing.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Jessica M. Van Dyke and David Collins, Nashville, Tennessee, for the appellant, Jose Lemanuel Hall, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General, Senior Counsel; Glenn R. Funk, District Attorney General; Katrin Miller and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This is Defendant's direct appeal from his first-degree murder conviction and consequent life sentence.  The following evidence was presented during the trial.

*Factual Summary*

The eighteen-year-old victim, Kendrya Davis, was found dead in an abandoned house on Cass Street in Nashville on April 3, 2011. She was last seen alive on March 28th. Her mother, Beverly Sutton, testified that her daughter was about to graduate from high school, and her family called her "Fat Momma," although her friends also called her "K.K." Ms. Davis would get around town by either riding the school bus or the city bus. She had a cellphone, but her account had only a limited number of minutes. Ms. Davis told her mom that Defendant was her boyfriend, but Ms. Sutton had never met him. Before she died, Ms. Davis believed that she was pregnant with Defendant's baby, but when Ms. Sutton accompanied her to "the clinic," Ms. Davis discovered that she was not.

Montoya Maxwell was Ms. Davis's older sister. She last saw Ms. Davis around 7:00 p.m. on March 28th. Ms. Davis had a black eye and asked to use Ms. Maxwell's phone. Ms. Davis said that she was going to call Defendant. Like Ms. Sutton, Ms. Maxell also believed Ms. Davis was in a relationship with Defendant. After speaking to Defendant, Ms. Davis went to Ms. Sutton's house before going to see Defendant. Ms. Maxwell confirmed that Ms. Davis had a bus pass and would catch the bus near their house to go to the main terminal downtown before catching a bus elsewhere.

On the last day Ms. Sutton saw her daughter, she believed that Ms. Davis was going to take a bus to her best friend's house. When she left, Ms. Davis was wearing blue jeans, a t-shirt, and Ms. Sutton's red jacket. Ms. Davis was not wearing the jacket when her body was found. After Ms. Davis went missing, Ms. Sutton called Defendant, but he said that he did not know where Ms. Davis was.

Cassandra Hughes testified that on the night of March 28, 2011, she was going to visit Ms. Davis's brother, whom she was dating, in jail at 8:15 p.m. On her way, she ran into Ms. Davis at the bus terminal downtown and noticed that she had a black eye. Ms. Davis was walking with Defendant, and she appeared to be "mad." Ms. Hughes noticed that Ms. Davis had a cellphone with her. That night, Ms. Davis told Ms. Hughes that she was pregnant.

Cell phone records confirmed that Ms. Davis placed a call to Defendant from Ms. Maxwell's phone, followed by numerous text messages between the couple. The last text message occurred at 7:56 p.m. on March 28, 2011, and was from Defendant to Ms. Davis.

Security video footage from the downtown bus station showed Defendant and Ms. Davis together at 8:10 p.m. on March 28, 2011. Defendant was wearing a turquoise shirt and a dark-colored hoodie with gold or yellow lining inside the hood.

Luis King was a bus operator for the Metro Transit Authority. In March 2011, he was working a shift from 4:00 p.m. to midnight, driving the number 22 Bordeaux bus from the Music City Center, which is the downtown bus terminal. The bus departed at 8:15 p.m. When Mr. King saw Ms. Davis on the news, he realized that she had ridden his bus on the day she disappeared. Mr. King recalled that when his bus stopped at the corner of Delta and Garfield, Ms. Davis exited the bus followed by Defendant. Mr. King had seen both of them on his bus before. That intersection is approximately an eight to twelve minute bus ride north of the downtown bus station. Although Mr. King did not notice Defendant getting back on the bus later, still photographs from the security video footage of the downtown bus station showed Defendant returning to the bus station on the number 22 bus at 10:09 p.m.

Defendant's grandmother, Ethel Ware, lived in northeast Nashville with her son, Steven Ware. On Sunday, March 27, 2011, Defendant's father brought Defendant to stay at Ms. Ware's house. Defendant brought a backpack with him. The next night, Defendant's girlfriend, Tierra Tucker, called Ms. Ware before Defendant returned home and informed her that Defendant had missed the bus. Ms. Ware knew that Defendant used a bus pass to get around town. Defendant returned to the house between 9:00 and 10:00 p.m. while Ms. Ware was watching television. Defendant asked Ms. Ware, "Granny, what get[s] blood out of clothes?" She noticed that Defendant had a blue shirt in his hand. Defendant explained that he had been hit in the mouth while playing basketball. Ms. Ware told him to soak the shirt in cold water, and she let him use her mop bucket to do so. Ms. Ware did not think much of this exchange at the time.

The following morning, Ms. Tucker called Ms. Ware's house early while "everybody was still asleep." Ms. Ware answered the phone and awoke Defendant, who was sleeping on the couch. Defendant spoke to Ms. Tucker then went back to sleep. Defendant did not return to stay with Ms. Ware after that night.

Detective Chad Holman of the Metro Nashville Police Department was the lead investigator in this case. Ms. Davis was reported missing on March 30, 2011. During his investigation, he learned that Ms. Davis called Defendant sixteen times from her school on March 28, 2011, beginning at 10:33 a.m. and ending at 1:52 p.m. Detective Holman also learned that Ms. Davis had been involved in an altercation near the downtown bus terminal on the same afternoon. He obtained a cell phone picture that was taken on March 28, 2011, just after 3:00 p.m., which showed Ms. Davis, Ms. Tucker, and Defendant during the altercation. Security video footage from the bus station showed Ms. Davis and Defendant both there at 3:36 p.m., but they were not together. At 3:51 p.m., Defendant and Tierra Tucker were there together.

When Detective Holman called Defendant to talk about Ms. Davis, Defendant said that he had not seen Ms. Davis since March 27th. Defendant admitted that he and Ms.

Davis had dated for several months but said they were no longer together. He became frustrated during the conversation and ultimately hung up on Detective Holman.

After midnight on March 31st, Defendant's father called Detective Holman, who then went to Ms. Ware's house. Defendant's father showed Detective Holman a red backpack with "several spent cartridges and a few live cartridges." Defendant's father, Jose Hall Sr., testified that once Ms. Davis was reported missing, he opened Defendant's backpack and discovered "a couple of live rounds and two spent cases." He then called the police. Crime Scene Investigator Rhonda Evans of the Metro Nashville Police Department was dispatched to Ms. Ware's house at 1:25 a.m. on March 31, 2011. She photographed a blue bucket inside a bathroom and took a picture of five cartridge casings and three bullets.

On April 2, 2011, around 11:30 p.m., Defendant surrendered himself to police on an outstanding warrant for an unrelated matter. After being informed a few hours later that Defendant was in custody, Detective Holman interviewed him early in the morning on April 3, 2011. During the interview, Defendant contradicted his earlier statement about the last time he had seen Ms. Davis, admitting that he had last seen her on Monday, March 28th, at the bus station. He said that Ms. Davis and Ms. Tucker got into an argument, during which he hit Ms. Davis. However, he denied knowing anything about Ms. Davis's whereabouts.

After the interview, Detective Holman began searching for Ms. Davis's body in abandoned houses in the northern part of Nashville based on information that he had received. While searching, he observed what appeared to be an abandoned house on Cass Street. Investigating further, he noticed that there was "very tall" grass in the front yard and that the front door was not closed. No one appeared to be inside the house. Detective Holman and Sergeant Pat Postiglione entered the house around 4:00 a.m. and discovered Ms. Davis's body. The house did not have electricity and the temperature was "in the mid to upper 30s." The inside of the house was "cold and damp" and "seemed colder than the outside."

Crime Scene Technician Lisa Whitaker of the Metro Nashville Police Department collected blood stain samples and photographed a live round found on clothing behind the door to the back bedroom. The parties stipulated that forensic analysis revealed that neither blood nor fingerprints obtained from the crime scene belonged to Defendant or Ms. Tucker.

Dr. Tom Deering was a senior associate medical examiner who performed the autopsy on Ms. Davis's body on April 4, 2011. There were scrapes and bruises scattered over her face. Ms. Davis had two stab wounds on the left side of her neck. There were two stab wounds to the lower right side of her chest. One of the wounds hit her lung, but

the nature of the injury suggested that she was almost dead when the wound was sustained. There were scrapes and a bruise on her right shoulder, and there was a bruise on her left forearm. There were also several stab wounds across the back of her left forearm, which were defensive wounds, and there were bruises on the back of her left hand.

Additionally, there was a gunshot wound to her right ear and jawbone; a gunshot wound on the left side of her forehead; and a gunshot wound to the top of her head. None of these gunshots penetrated her skull, and there was not much bleeding associated with these wounds. Due to the dearth of bleeding from these wounds, Dr. Deering determined that Ms. Davis already had low blood pressure when the gunshot wounds occurred, which suggested that she was nearly dead when the wounds were inflicted. There was another gunshot wound to her right hand. Unlike the gunshot wounds on the head, this wound had "moderate bleeding," which suggested that this wound occurred before the others. The nature of this gunshot wound was consistent with Ms. Davis having raised her hand to protect herself.

It was Dr. Deering's opinion that strangulation was what ultimately caused Ms. Davis's death. "Multiple linear abrasions" on her neck, hemorrhaging in the soft tissue around the hyoid bone in her throat, and burst capillaries in her mouth and eyes were all signs of strangulation. However, Dr. Deering was unable to determine the time of death.

Special Agent Teri Arney of the Tennessee Bureau of Investigation testified that she compared the four bullets recovered from Ms. Davis's body and determined that three of them were fired from the same .22 caliber handgun. The fourth bullet was the same caliber but the individual characteristics of the bullet were inadequate to make a positive identification. Likewise, the five shell casings retrieved from Defendant's backpack were fired from the same .22 caliber handgun. The bullets and the casings were the same caliber, type, and design. However, Special Agent Arney could not determine whether the bullets and the casings were fired from the same gun without being able to examine the gun.

After holding a hearing to determine unavailability, the trial court admitted a recording of the preliminary hearing testimony of Vincent Lindsey. Mr. Lindsey was twenty years old at the time of the preliminary hearing. He admitted that he was a member of the Gangster Disciples and was known by the name "Paperboy." He knew Ms. Davis and knew that she was Defendant's ex-girlfriend. At the time Ms. Davis went missing, Mr. Lindsey had only known Defendant for three or four months.

On a Tuesday or Wednesday in March 2011, Mr. Lindsey went to hang out at Rivergate Mall with Defendant, Ms. Tucker, and a friend of Defendant, who was someone Mr. Lindsey did not know. While the group was on the bus en route to the mall,

Defendant saw another friend of his. Defendant pulled a handgun out of his pocket a little bit and jokingly said, "Don't make me pop you." The handgun was a small black revolver with a white handle and appeared to be either a .22 or .25 caliber. Ms. Tucker told Defendant to put the gun away.

After being at the mall for about forty-five minutes, Defendant and Mr. Lindsey went outside near the food court to smoke. Defendant told Mr. Lindsey, "I killed Fat Momma last night." Defendant said that he shot and stabbed her in an abandoned house "out north" on 10th Street, but he did not say why he killed her. Defendant instructed Mr. Lindsey not to tell Ms. Tucker. Mr. Lindsey could not believe what Defendant told him and thought that he may have been lying. At that time, Mr. Lindsey did not know that Ms. Davis was missing, and he did not believe what Defendant had told him until he saw on the news that Ms. Davis was missing. Mr. Lindsey recalled that Ms. Tucker was wearing a black bandana that day, which he explained "means murder."

That night, Mr. Lindsey told his girlfriend, Bianca Curll, what Defendant had revealed to him at the mall. Mr. Lindsey decided to call Ms. Davis's cousin, Marcelus Johnson. He then spoke with Marcelus's mother, who was Ms. Davis's aunt, and told her that he knew where Ms. Davis's body was. Mr. Lindsey thought contacting Ms. Davis's family was the right thing to do because they needed some closure. Mr. Lindsey agreed to meet with the aunt but later changed his mind. Mr. Lindsey was worried that he would be accused of the murder because he knew the details.

Mr. Lindsey testified that Defendant was a member of the Five Deuce Hoover Crips. Detective Mark Anderson of the Metro Nashville Police Department testified that he was an officer in the gang unit and that he was familiar with the Five Deuce Hoover Crips in Nashville. He explained the gang's history as follows:

> Crips originated in L.A. late '60s, early '70s and through time has evolved into different sets or clicks of gangs under, all calling themselves Crips, but there is different types of Crips. In particular, you spoke of Five Deuce Hoover Crip, it started at the 5200 block of Hoover in L.A., it evolved throughout time and migrated to Nashville and the particular Five Deuce Hoover Crips here in Nashville followed basically the same philosophy as the L.A.-based 52 Hoover.

Detective Anderson also explained the organizational hierarchy of the Five Deuce Hoover Crips:

> [A] Loc [is] kind of a foot soldier. I also compare this to the police department and our rank structure, to kind of help you understand. A Loc would be, you know, my position as a detective or an officer. BG would be

referenced as maybe a sergeant in the police department, and then YG may be a lieutenant in the police department. OG would be maybe a captain or a commander. OOG would be, you know, a deputy chief, and then [O]OOG would be the chief. . . . Your sponsor would be referred to as a big homie or someone that is ranked higher than you, you would refer to them as a big homie.

Detective Anderson then described the process of promotion within the gang:

The way to move up in a gang is by violence primarily. You can do it through drug trade or a few other things, but the easiest and fastest way is through violence. It is never really fast unless you commit a murder or something, but "putting in work" is a term used for putting in violence for the particular gang, and if you put in a lot of work for the gang, that means, you know, violence against the rivals, then that can accelerate your rank system in the gang.

However, Detective Anderson said that violence against civilians who are not enemies of the gang does not lead to promotion in rank and is usually frowned upon. Specifically, killing the mother of one's child could jeopardize one's rank and membership in the gang. Detective Anderson also explained that a gang member talking to the police is "frowned upon" and can be grounds for discipline. Similarly, a gang member testifying in court can be "extremely, extremely dangerous."

Additionally, Detective Anderson testified about some of the gang's terminology:

An H-call would be a meeting set by a high ranking member of the gang, probably an OG, if an OG puts the H-call out that means it is a mandatory meeting where you would have to show up. If you do not show up and attend the meeting, you would be in violation. A Y-call would be someone of YG rank attempting to call all of those subordinates to the YG for a meeting.

On April 3, 2011, after turning himself in to the police, Defendant made numerous calls to Ms. Tucker from the jail's booking area. The State played recordings of numerous phone calls for the jury. Excerpts from some of the most probative calls are summarized and quoted below.

At 4:48 a.m., Defendant called Ms. Tucker's home phone number. After discussing Defendant's interview with the police, he instructed her:

Defendant: Don't give nothin' on nothin'.

Tucker:        Yeah.
Defendant:    Just listen.  Nothin' on nothin' until I get out.  You hear me?
Tucker:        You said nothin' on nothin'?
Defendant:    Nothin' on nothin'.  Noth-ing.  Okay?
Tucker:        Yeah.

At 4:53 a.m., Defendant again called Ms. Tucker's home phone number:

Defendant:    Baby, I need you to call Unc, right?  Listen.  You hear what I'm saying?
Tucker:        Yeah.
Defendant:    Tell him that blue shirt and them pants, get rid of them.  Now, don't argue with me or nothing.
Tucker:        Yeah.

Detective Holman testified that Defendant's turquoise blue shirt was never recovered.

At 4:58 a.m., Defendant called again, and said, "I'm thinking about calling Paper, cuz, and going ham on him."  Shortly thereafter, in a phone call made at 5:38 a.m., the following occurred:

Defendant:    After school, go home.  Eyes, ears.  You is my eyes and ears.  You know what to look for and what to watch for.  You hear me?
Tucker:        Yes.
Defendant:    Man, if I see (inaudible) downtown n*****, I swear I (inaudible) cheap old Paper. . . .  [A]fter court, n*****, I'm going to say, "Momma, let me go down here real quick.  I need to find a bus card. . . . I see him, I'm going to beat him.  I'm going to beat the s*** out of him downtown. . . .
Tucker:        Well, he locked up, cuz.
Defendant:    I'm going to beat the s*** out of him when I'm downtown.  F*** it. . . .  No man, g**damit, dumb a** n***** is playing and s***.
Tucker:        I already know, I'm just saying.  He locked up, baby.

In a phone call made at 5:47 a.m., Defendant told Ms. Tucker, "I gave Monsta my phone so I didn't have [to] bring it down here because that's the first thing they ask for.  'So where your cell phone at?'  'Ha, I ain't got it.'"  During the same call, the morning news can be heard in the background talking about Defendant's case.

Defendant:     . . . Yeah, the news on right now.  Hello?

-8-

| | |
|---|---|
| Tucker: | Yeah. |
| Defendant: | Hey, baby. Just look. |
| Tucker: | Huh? |
| Defendant: | Just look. You got to see this s***. This s*** is fixin' to be funny. |
| Tucker: | All right, it's on now. |
| Defendant: | I know it's on now. |
| [Background voice] | |
| Defendant: | Damn. They need to take that off. |
| [Background voice] | |
| Defendant: | Hello? |
| Tucker: | Yeah. |
| Defendant: | I got to get out of here tomorrow when I go to court. (Laughter) |
| Tucker: | N*****, take my baby off— |
| Defendant: | Huh? What? |
| Tucker: | I said they need to take my baby off t.v. |
| . . . . | |
| Defendant: | . . . . What they say on the news, baby? They said that she was, that, that, they found her? Now, they say, they say what? |
| Tucker: | They just said what they said about you and her then they was like they talked to a person but they're not telling who. |

In a phone call made at 6:16 a.m., Defendant again told Ms. Tucker, "Call Unc and tell him about that, that s***."

In a phone call made at 8:43 a.m., the following occurred:

| | |
|---|---|
| Tucker: | Okay. Yeah, they found her or whatever. |
| Defendant: | Oh, for real? |
| Tucker: | Hell yeah. They up here right now.[1] |
| Defendant: | Oh, you seen 'em? |
| Tucker: | Yeah. |
| Defendant: | Oh, they'll be down here f***ing with me tonight. |
| Tucker: | Okay, but what I'm saying is— |
| Defendant: | I mean shut up. These phones. |

---

[1] Detective Holman testified that Ms. Tucker lived in a house on Owen Street, which from the record appears to be about two blocks from the abandoned house on Cass Street where Ms. Davis's body was found.

Tucker:        That's crazy.  Yeah, they gonna be down here f***ing with me too.

Defendant:     Uh huh.  Better hope they do something before I go to court tomorrow.

Tucker:        Yeah, yeah, they come at me hard, talking about, um.

Defendant:     Huh?

Tucker:        Damn.  G**dam.

Defendant:     What?

Tucker:        Uh, phone, baby.

. . . .

Tucker:        . . . . I've got a question to ask you, and I can't even.

Defendant:     What?

Tucker:        Huh?

Defendant:     What?

Tucker:        'Cause they goin', um, probably be like, um, "Have y'all been in there?  Have y'all?  Uh, uh, Jose, have you ever been in there or nothing?"

Defendant:     No, f*** that s***.

Tucker:        Huh?

Defendant:     F*** that s***.

Tucker:        Is that a no or a yeah?  Huh?

Defendant:     Uh…

Tucker:        Baby?

Defendant:     Hold on.  Say—

Tucker:        Huh?

Defendant:     Yeah, I don't care.  What did you want to say, no or something?

Tucker:        Baby?

Defendant:     I don't know!  Damn.

Tucker:        (deep sigh)

Defendant:     I just said I don't know.

Tucker:        Huh?

Defendant:     I just told you, I don't know.

Tucker:        Oh, my goodness.  If the phone hangs up, call me right back, okay?

Defendant:     Oh yeah.

. . . .

Defendant:     You need to go outside and be looking at what the f*** they doing.

Tucker:        Baby, they up there taking stuff, like, putting stuff in bags and all of that.

During a call placed at 8:49 a.m., the discussion continued:

Defendant:   Hello.
Tucker:      Yeah, well, uh on that, I need a yes or no 'cause they going to ask you then they going to ask me. And which, whichever one ask—
Defendant:   Yo, that was our little chill spot.
Tucker:      Huh?
Defendant:   That was our little chill spot. We was in there smoking and s***. You hear me?
Tucker:      Yeah.
. . . .
Tucker:      Yeah. That's our little chill spot.

During a call made at 8:55 a.m.:

Tucker:      When was the last time we chilled at the spot?
Defendant:   Huh?
Tucker:      When was the last time we chilled at the spot? Because they going to ask.
Defendant:   Oh yeah. Man, uh. Sunday.
Tucker:      Mmhh?
Defendant:   Uh, I don't know. Uh, s***. I don't know. Seem like a week ago. Don't got to be no exact date, no exact day. Like, s***, like two weeks ago.
Tucker:      Yeah, about two because you went out of town.
Defendant:   Mmhhm.
Tucker:      Huh?
Defendant:   Yeah.
Tucker:      Yeah, it was about two.

About a month later, on May 5, 2011, at 12:39 p.m., Defendant placed a call to Gregory Burrell, known as "Low Down."[2] The following conversation ensued:

Defendant:   What's crackin', n*****?
Burrell:     What's up, man?
Defendant:   Man, nothing. Groovin', man.
Burrell:     What?
Defendant:   Man, just chillin'. What are you doing though?

---

[2] Detective Holman testified that Mr. Burrell's rank in the gang was "O.O.", which means he was one of the gang's leaders.

| | |
|---|---|
| Burrell: | Man, you know I am upset with you, man. |
| Defendant: | How you upset with me, cuz? What did I do? |
| Burrell: | What you mean, what you do? |
| Defendant: | What did I do? |
| Burrell: | Don't talk crazy. Why you in there? |
| Defendant: | Man, cuz, man. Man, I'll, I'll write you a letter, cuz. |
| Burrell: | Well you need to. You need to explain. Because what I'm getting, I don't like it. |
| Defendant: | Yeah, I, I know. |
| Burrell: | Your own seed, cuz. Your own seed. |
| Defendant: | Cuz, it ain't like that. Nothing at all. |
| Burrell: | Well, you need to write me and talk to me. You need to write me. |
| Defendant: | Yeah. |

Several months later, on August 10, 2011, Defendant called Ms. Tucker, during which the following occurred:

| | |
|---|---|
| Tucker: | Some detectives came to see me. |
| Defendant: | Whoa, for real? |
| Tucker: | Yeah, but I wasn't here. I was at work. |
| Defendant: | Oh. |
| Tucker: | And they called talkin' that bull. |
| Defendant: | About what? That little other s***? |
| Tucker: | Yeah. |
| Defendant: | F*** 'em. What else y'all talk about? |
| Tucker: | They mad 'cause I won't say anything. Talking 'bout whatever. They are going to charge me with accessory. |
| Defendant: | (laughter) |

Later during the call, the following exchange occurred:

| | |
|---|---|
| Defendant: | Did you tell Low Down what I said? |
| Tucker: | Hell no. I'm going to tell him tonight. I think he's coming up. I don't get him. I, uh, called an H-call or whatever so— |
| Defendant: | Where he at? |
| Tucker: | Huh? |
| Defendant: | Where? He at the house? |
| Tucker: | Yeah. |
| Defendant: | Call him. |
| Tucker: | Baby, I'm on my house phone. |
| Defendant: | Damn. 'Cause I'm going to call you back. |

. . . .

Tucker:     Oh, did you get my letter about Counterfeit?[3]

Defendant:  Yeah.

Tucker:     Yeah, he's been trying to call. He's been calling and s***.

Defendant:  He's been calling you?

Tucker:     Yeah

Defendant:  Talking about what?

Tucker:     Nothin'. Trying to, um, see, uh, 'cause he was like he hope y'all can be cool when you get out and—

Defendant:  Hope we could be cool when I get out? (laughter)

Tucker:     Yeah.

Defendant:  "I've been in here six months because of you, cuz."

Tucker:     Wait. Then he was like the only reason—Bianca was like the only reason he went up there because they told him if he didn't they was going to say he was in the house.

Defendant:  Huh?

Tucker:     He was. Bianca was like the only reason he testified was because they told him if he didn't they was going to, um, they was going to say he was up there.

Defendant:  Oh, f*** that s***. But anyways, though. How I say is too, too late this. You feel me? That's a word: too-too-late. You feel me? (inaudible)

. . . .

Tucker:     Deuce got to get him, baby, because if it wasn't for him, you wouldn't have got indicted.

Defendant:  Who?

Tucker:     If it wasn't for him doing that, you wouldn't have even got indicted.

Defendant:  Yeah.

Tucker:     And they, and they basically conned him, blackmailed him, when he didn't even have nothing to do with it.

Defendant:  You need—that's why you need to call my lawyer.

. . . .

Defendant:  Listen. Tell him that. Shut up. Tell him that and then let Paperboy tell—let Counterfeit tell him what they told him to say. . . .

. . . .

Defendant:  They can't blackmail nobody to get me locked up.

Tucker:     Yeah, they said that's what they told him.

---

[3] The proof indicated that Mr. Lindsey was known as both Counterfeit and Paperboy.

Defendant: Talking about we can, we can be cool when I get out. Yeah, we can kick it. Smoke a couple of blunts. Too-too-late.
Tucker: You know, you know.
Defendant: Ba-dow. Ba-dow. I'm just chillin' though. . . .

On August 12, 2011, a couple of days after the phone call, Defendant sent a letter to Ms. Tucker which contained the following excerpt:

Baby, what the homies think about this Counterfeit s***? Baby, s***. What was all said in the H-call, baby, and who said what, cuz? If you ever want to talk about something in the mail, do it. Just don't write s*** about K-K or anything that has anything to do with her. Okay, baby? But anything like Counterfeit, say—you can just make sure you put Counterfeit said this, that, this 'cause when they check our mail they just make sure it's no gang s*** like big a** H's, s*** like that. As long as you just write how you do then it's cool, baby.

During a phone call on September 3, 2011, the following exchange occurred:

Defendant: Shut up. Listen. They got a court order to listen to all of your calls on your house phone.
Tucker: What you say, baby?
Defendant: There is a court order. They got a court order to listen to all of your phone calls on your house phone.
Tucker: Oh, okay.
Defendant: Yeah, so they listening to your momma, Granny phone calls, all of that. And don't call, uh, Counterfeit no more either, so no one can say we threatening him.
Tucker: What?
Defendant: Don't call Counterfeit no more. I don't want to hear him say we threatening him or nothing.
Tucker: Okay.
. . . .
Defendant: . . . . I wrote you a five page letter then I wrote you a little letter. The, uh, the home boy tomorrow, answer your phone around about . . . like two o'clock because, uh, one of the homeboys is going to read you some s*** that I told him to tell you that I can't say over the phone.
Tucker: Okay.
Defendant: Don't write nothing reckless in my letters. Tell none of the homies to write nothing reckless. My letters are being copied, read, and copied so they can take them to court. My

-14-

> ingoing letters, my outgoing letters, all are being read and copied. Your house phone got a tap on it. They listening to all of the call[s] on your house phone. Only safe phone is your cell phone.
>
> . . . .
>
> Defendant: . . . . [A]ll that s*** in that paperwork, man, it ain't got s*** in there about you. That, like, s*** ain't nothing really they got on me, but there is like one little thing they got on me. The homeboy will read it to you tomorrow. There is only one thing they got on me. The rest of that s***—
>
> Tucker: What you say, baby?
>
> Defendant: There is only one thing they got on me. The homeboy will read it to you tomorrow. There is only [one] thing they got, but other than that, we good.
>
> Tucker: Is it bad?
>
> Defendant: Uh, not really. Yeah.
>
> Tucker: It is?
>
> Defendant: The bullet.

Defendant also told Ms. Tucker that he was going to send her a copy of his discovery materials, and said, "Read it from the front to the back. My Daddy a snake."

The following excerpts are from a letter that Defendant sent to Ms. Tucker on September 2, 2011:

> [S]top calling Counterfeit so he can't say that we threaten him. Hey, your house phone is tapped. They got a court order to listen to all y'all calls incoming and outcoming . . . . if you do call, call on your cell phone, and don't say s*** about this on the phone, baby[.]
>
> . . . .
>
> I'm good. I just got to wait this b**** out, all right. My mail coming in and going out is being read and copied so don't say s*** else about Counterfeit or K-K or the case in no letter. Don't talk to nobody about this, cuz. They ain't got s***, so let's not give them s***, cuz. Don't dare talk crazy on your house phone, cuz.

This excerpt is from a letter sent by Defendant to Danny Clemons, known as Mini Deuce, on September 20, 2011:

Don't know what happened then call [phone number]; it my cousin KV. Ask her what happened, cuz. Ay, cuz, as soon as you get done reading this go take this letter to the post office ASAP, cuz. This is a YG-call, cuz, and if she locked up, y'all need to write her ASAP, cuz. Y'all know if it was y'all she will do it for you, cuz. Give this [phone] number . . ., cuzz. That's the n**** number Paperboy. His picture is on Facebook. Go on my page [login and password], cuzz. Look up Bianca or something like that. She light skin. Look at her pics. A light skin n****. Monsta Deuce and Deuce-wit-it know what he looks like, cuz. You always wanted your BG, cuz, and I know he will love to see your friend. You know what I'm sayin'? Tell Loc and Monsta MSH, orange and black, cuz. He got the Deuce f***ed up, cuz. It Hoova or f*** your hood, cuz. I don't care what goes on, tell Loc to find Groove, cuz. It's time we show n****s how strong the turf really is, cuz. And anybody that don't want to put no work in, rack them on my call.

. . . .

Cuz, look up the info ASAP, cuz. The n**** stays at the bus station all day every day, cuz. I know I shouldn't be writin' like this, but f*** it, cuz. I would do life for my baby, and this ain't no jail talk, cuz. Tell Loc, Monsta, Snikey, and V-loco that I want to see how they got their status, cuz, if yall do this on this paper, cuz, and think like a lil big homie, cuz (I need you to think out of anger with this s***). I don't give a f*** if she out or not. It's time we do us, cuz. We takin' too many L's, cuz, like we some b****es, cuz. Then I'll give you your BG, cuz. I need y'all to handle this problem, cuz. Call Low Down and tell him what's going on and that I want him and y'all to handle this problem, cuz.

Michael Grigsby testified that in April 2011, he was housed in the jail with Defendant, and Defendant made a confession to him about a murder. Mr. Grigsby explained:

[I]t was a woman that was pregnant. He basically didn't want her to have his child. He took her to an abandoned home, another lady was with him and they shot her and stabbed her and left her for dead. It was over three years ago . . . . It was just some evil stuff, man. The lady got off the bus, walked down the street, and they took her to the abandoned house and met another lady. He didn't never speak of the gal's name, but he was talking to her mutual [sic] times in jail, talking about her in jail a lot.

-16-

Mr. Grigsby said that he decided to testify when he "was fixin' to get into a fight with . . . one of [Defendant's] gang members . . . ."

Ronald Jones testified that he was incarcerated with Defendant in the county jail in March 2012. During a conversation, Defendant told Mr. Jones that he killed Ms. Davis. Defendant said that he ran into his ex-girlfriend at the downtown bus station. They exchanged phone numbers, even though Defendant already had a girlfriend at the time. Ms. Davis "kept calling" Defendant, and eventually his girlfriend found out about it and became upset. During an encounter, Ms. Davis "swung a knife" at Defendant's girlfriend. Later, Defendant tricked Ms. Davis by telling her "that he was trying to rekindle the relationship and he led her to an abandoned house." They took the bus to the house. Defendant told Mr. Jones that "he tried his famous choke hold and that didn't work" so Defendant "pulled out his deuce deuce," and shot Ms. Davis twice in the head. Defendant said that he threw the gun off a bridge but his father found two shell casings in his backpack. Defendant also told Mr. Jones that he had asked his grandmother how to get blood out of his clothes and told his girlfriend to get rid of his clothes, which she burned. Defendant explained to Mr. Jones that the reason he was caught was because he told a friend that he killed "Big Momma" and his friend relayed this confession to Big Momma's aunt.

Investigator Kevin Carroll of the Davidson County Sheriff's Office confirmed that jail records showed that Defendant was incarcerated with Mr. Grigsby and with Mr. Jones at different locations.

With the foregoing evidence, Defendant was convicted of first degree murder and received a life sentence. The trial court denied his motion for new trial, and Defendant filed a timely notice of appeal.

*Analysis*

Defendant raises the following issues on appeal: (1) whether the evidence was insufficient to support his convictions; (2) whether the trial court erred in admitting gang-related evidence; (3) whether the trial court erred in admitting photographs of Defendant at the bus station; and (4) whether the trial court erred in ordering consecutive sentencing.

A. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces

the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

As applicable to this case, first degree murder is described as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18).

Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261

-18-

(Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or concealment of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *Bland*, 958 S.W.2d at 660; *Jackson*, 173 S.W.3d at 409; *Nichols*, 24 S.W.3d at 302; *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660. One well-regarded treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003); *State v. Berry*, 141 S.W.3d 549, 566 (Tenn. 2004).

Giving the State the strongest legitimate view of the evidence, the evidence shows that the victim was Defendant's ex-girlfriend and that he was under the impression that she was pregnant with his child. On March 28, 2011, the victim called Defendant numerous times throughout the day while she was at school. During the afternoon, the victim and Defendant's girlfriend got into argument at the downtown bus station, during which Defendant hit the victim. Later that evening, after exchanging numerous text messages, Defendant and the victim met at the bus station and took the number 22 bus to the corner of Delta and Garfield near the crime scene. Defendant then led the victim to an abandoned house on Cass Street where Defendant's girlfriend was waiting. Inside the house, the victim was strangled, stabbed four times, and shot four times with a .22 caliber handgun. Later that night, Defendant returned to his grandmother's home and asked her how to remove blood from his clothing. The next day, Vincent Lindsey saw Defendant in possession of a small caliber revolver that appeared to be a .22 caliber, the caliber of the murder weapon. At the Rivergate Mall, Defendant confessed to Mr. Lindsey that he

killed the victim in an abandoned house in the northern part of Nashville by shooting and stabbing her to death. Not long after the victim was reported missing, Defendant's father found five .22 caliber shell casings and three live rounds in Defendant's backpack. After surrendering himself to police and while in custody, Defendant made numerous phone calls and sent several letters to fellow gang members, including his girlfriend, during which he showed a striking consciousness of guilt. He instructed his girlfriend to destroy some of his clothing. He told her to watch the crime scene carefully while it was investigated by law enforcement officials and appeared to have knowledge of details of the crime before they would have been made known to the public. Defendant displayed animosity toward witnesses in this case, specifically his father and Mr. Lindsey, and had multiple conversations and correspondence with his gang about ensuring that Mr. Lindsey would not testify in court or cooperate with investigators. He also instructed his girlfriend not to cooperate with investigators and repeatedly informed her not to talk about the victim over the phone or in her letters to Defendant. During several phone calls, Defendant and his girlfriend coordinated their story about their connection to the crime scene in anticipation of additional questioning from investigators. Additionally, Defendant confessed in extensive detail to killing the victim to two different fellow inmates while in jail.

Defendant's argument on appeal rests on inconsistencies in the evidence presented at trial, the credibility of the three witnesses who testified about Defendant's confessions, and the lack of physical evidence connecting him to the crime scene or the victim's body. However, the evidence presented at trial was sufficient for a rational jury to find proof beyond a reasonable doubt of all of the elements of first degree murder. It is within the province of the jury to evaluate witness credibility and sort through inconsistencies in the evidence. We will not review those determinations on appeal. He is not entitled to relief on this basis.

## B. Gang-Related Evidence

Defendant argues that the trial court erred by admitting evidence of his gang membership because it was irrelevant and its probative value did not substantially outweigh the risk of unfair prejudice as required by Tennessee Rule of Evidence 404(b). The State disagrees.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, it may be inadmissible. Tenn. R. Evid. 403. However, "[e]vidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); *State v. Parton*, 694 S.W.2d

299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). Yet, such evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme" or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Other act evidence may be admitted for these purposes only after the following requirements have been met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). However, "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (internal quotation and citation omitted).

A trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed under an abuse of discretion standard if the trial court has substantially complied with the procedure mandated by the Rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Where the trial court has failed to substantially comply with the procedural dictates of Rule 404(b), the standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-653)). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (internal quotation and citation omitted).

Prior to trial, the State gave notice of its intent to introduce evidence of Defendant's gang affiliation, and Defendant filed a motion in limine to exclude that evidence. The trial court held a 404(b) hearing, during which it heard testimony from Detective Anderson and Detective Holman about the investigation and about the gang

references in Defendant's phone calls and correspondence. By written order, the trial court decided to reserve its ruling until trial.

At trial, while outside the presence of the jury, the court made the following ruling on this matter:

> [T]he court is of the opinion that the defendant's statements . . . where he offers someone increase in gang status in exchange for harming or threatening Paperboy are highly probative in this case, and again I will say that I think that the threat to a witness is relevant as a circumstance from which the defendant's guilt could be inferred.
>
> The court will give the jury limiting instructions on all of this stuff about gangs and the man is not on trial for being in a gang . . . so I think it is best understood by the jury when conveyed through the defendant in his own words . . . rather than having the detective infer or summarize . . . a threat made from the words of the paragraph.
>
> . . . .
>
> I think without [Detective Anderson] testifying about what these things mean the meaning of the letters is going to be very difficult for anybody to discern. So, I think he can testify about what these different things mean and within reason we will let the jury consider it, and I will instruct them again that the gang thing is not something that is indicative of his disposition to commit the crime the he is on trial for and that is the best I can do . . . .

Because the trial court substantially complied with the procedure set forth in Rule 404(b), our review is for an abuse of discretion. On multiple occasions, our courts have determined that evidence of gang affiliation or gang-related conduct may be admissible for a non-propensity purpose if the rules of evidence are satisfied.[4] In this case, the trial

---

[4] *See, e.g.*, *State v. Shasta Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *9-10 (Tenn. Crim. App. Nov. 5, 2015), *perm. app. filed* (Jan. 4, 2016); *Abbas Nejat v. State*, No. M2014-01730-CCA-R3-PC, 2015 WL 3540401, at *6 (Tenn. Crim. App. June 5, 2015), *no perm. app. filed*; *State v. Ken Parker*, No. W2012-00827-CCA-R3-CD, 2014 WL 217305, at *7-11 (Tenn. Crim. App. Jan. 17, 2014), *perm. app. denied* (Tenn. June 20, 2014); *State v. Montez James*, No. W2011-01213-CCA-R3-CD, 2012 WL 4340658, at *11-12 (Tenn. Crim. App. Sept. 24, 2012), *perm. app. denied* (Tenn. Feb. 13, 2013); *State v. Erik Guerrero*, No. M2010-00851-CCA-R3-CD, 2011 WL 3107722, at *12 (Tenn. Crim. App. July 25, 2011), *perm. app. denied* (Tenn. Nov. 17, 2011); *State v. Ronald Eugene Brewer, Jr.*, No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *16-17 (Tenn. Crim. App. July 14, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011); *State v. Quinton Sanders*, No. W2006-00760-CCA-R3-CD, 2009 WL 1424188, at *7-8 (Tenn. Crim. App. May 20, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009); *State v.*

court found that the gang-related evidence within Defendant's phone calls and written correspondence was relevant evidence of Defendant's consciousness of guilt about the crime because he was actively and extensively involved in coordinating efforts to pressure a key witness into recanting his statement or failing to appear at trial. This is a proper non-propensity purpose to admit evidence under Rule 404(b). *State v. Maddox*, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) ("Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." (quoting *Tillery v. State*, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978))). The trial court also found that testimony from Detective Anderson as a gang expert would greatly assist the jury in understanding the nature of the evidence, including references to the gang's rank and organizational hierarchy. This Court has previously held that gang expert testimony is permissible where it would assist the trier of fact in understanding the evidence before it. *See, e.g.*, *State v. Robert Edward Fritts*, No. E2012-02233-CCA-R3-CD, 2014 WL 545474, at *15-16 (Tenn. Crim. App. Feb. 10, 2014), *perm. app. denied* (Tenn. Sept. 19, 2014); *State v. Justin Mathis*, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *8-9 (Tenn. Crim. App. July 20, 2007), *perm. app. denied* (Tenn. Dec. 26, 2007).

Defendant complains specifically about testimony from Detective Anderson that achieving a promotion in gang rank was accomplished through violence. Defendant maintains that, because Defendant held a ranking position within the gang, the jury could have inferred that he had committed previous violent acts to obtain that rank and then used that inference as propensity character evidence.

Defendant used his authority as a ranking member in the gang to mobilize his subordinates and other leaders in the gang to search for Mr. Lindsey. Testimony about the hierarchy of the gang was necessary to make the evidence comprehendible for the jury. Detective Anderson's testimony that promotion in rank was achieved primarily through violence explained why the other gang members would have been motivated to act on Defendant's orders. During some of Defendant's correspondence, he instructs his associates to "rack" those in the gang who were unwilling to "put in work," that is, to

---

*Shakir Adams*, No. W2006-02038-CCA-R3-CD, 2008 WL 1891451, at *9-10 (Tenn. Crim. App. Apr. 29, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008); *State v. Jarvis Harris*, No. W2006-02234-CCA-R3-CD, 2007 WL 2409676, at * 8 (Tenn. Crim. App. Aug. 24, 2007), *perm. app. denied* (Tenn. Jan. 28, 2008); *State v. William J. Ford*, No. W2010-01205-CCA-R3-CD, 2002 WL 1592746, at *10 (Tenn. Crim. App. July 12, 2002), *perm. app. denied* (Tenn. Dec. 16, 2002); *State v. G'Dongalay Parlo Berry*, No. M1999-00824-CCA-R3-CD, 2001 WL 1251240, at *10-11 (Tenn. Crim. App. Oct. 19 2001), *perm. app. denied* (Tenn. Mar. 4, 2002); *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3-4 (Tenn. Crim. App. June 27, 2001), *no perm. app. filed*; *State v. Carlos D. Haywood*, No. 02C01-9707-CR-00289, 1998 WL 855436, at *5 (Tenn. Crim. App. Dec. 11, 1998) (citing cases). *But cf. State v. Lavelle Mangrum*, No. W2013-00853-CCA-R3-CD, 2014 WL 3744600, at *7 (Tenn. Crim. App. July 28, 2014), *perm. app. denied* (Tenn. Dec. 17, 2014) (determining that evidence of the defendant's gang affiliation was improperly admitted).

help locate and intimidate Mr. Lindsey. Detective Anderson testified that putting in work usually referred to violent conduct. Thus, if gang promotions are often obtained through violent conduct and violent conduct against Mr. Lindsey was authorized by Defendant, that would explain why Defendant promised to seek promotions for those who followed his orders in regard to Mr. Lindsey.

Additionally, Detective Anderson's testimony that promotion in rank was achieved primarily through violence also supplied a possible motive for Defendant to have committed this crime—to increase his own rank within the gang. Although the State's primary theory of motive was that Defendant did not want the victim to bear his child, there was some evidence to support the State's secondary theory that Defendant also believed that the murder would garner more respect for him within the gang, even though this may have turned out not to be the case. During phone conversations with his girlfriend, Defendant reveals his belief that he should be recommended for a promotion to Y.G., the next level in the gang, and there is also discussion about Ms. Tucker being promoted to B.G. From the context, it is not clear that these conversations are based on their conduct relating to this case, but the jury was entitled to determine how much weight to put on this evidence.

The trial court found that the gang-related evidence was "highly probative" and implicitly determined that its value substantially outweighed the potential prejudice. We cannot say the trial court abused its discretion in this regard. Furthermore, the trial court's limiting instruction told the jury that they could not use evidence of Defendant's character as a gang member as evidence of his guilt in this case, and the jury is presumed to have followed that instruction. *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). We also note that no evidence was admitted about other specific acts of violence committed by Defendant.

After reviewing the record, we do acknowledge, though, that Detective Anderson's testimony and some of the excerpts of Defendant's conversations and correspondence contained extraneous gang-related information that was not relevant to this case, such as the origin of the Five Deuce Hoover Crips. However, the quantity of this information was minimal and the quality was innocuous in light of all the properly admitted evidence throughout the course of the trial. Therefore, we conclude that any error in the trial court's admission of gang-related evidence was harmless.

C. Photographs

Defendant argues that the trial court erred by admitting photographs from the security video footage recorded at the bus station because they were so unclear that they had "zero probative value" without the testimony of Detective Holman. "The admission of photographs is generally discretionary with the trial court and, absent an abuse of that

discretion, will not result in the grant of a new trial." *State v. Banks*, 271 S.W.3d 90, 168 (Tenn. 2008). Here, we find no abuse of discretion. These photographs were probative to show that Defendant was one of the last people to see the victim alive and that Defendant returned to the bus station that night on the same bus that Mr. King said he was on with the victim. We admit that some of the still photographs were pixelated and not of the highest quality. Nonetheless, the photographs do show enough detail to be helpful to the jury. Furthermore, Detective Holman was personally familiar with the appearances of both Defendant and the victim and was competent to testify to the identity of the individuals in the photographs. He also said that the quality of the video footage that he viewed in real time was better than the still photographs taken from the footage.[5] The jury was free to make its own determination about the contents of the photographs and to accept or reject Detective Holman's accompanying testimony. Defendant is not entitled to relief on this issue.

## D. Consecutive Sentencing

After the sentencing hearing, the trial court imposed a life sentence and ordered that it be served consecutively to the effective life sentence Defendant received in another case. *See State v. Jose Lemanuel Hall, Jr.*, No. M2013-02090-CCA-R3-CD, 2014 WL 4384318, at *1 (Tenn. Crim. App. Sept. 5, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015). Defendant argues that the State failed to comply with Tennessee Code Annotated section 39-13-208 because it did not file a notice prior to trial and that the trial court did not hold a sentencing hearing that complied with the requirements of Tennessee Code Annotated section 39-13-204(a). The district attorney's office is required to give thirty days' written notice when it "intends to ask for the sentence of imprisonment for life without possibility of parole." T.C.A. § 39-13-208(b). When it does so, the trial court must hold a separate sentencing hearing in which the trier of fact must find one or more statutory aggravating factors beyond a reasonable doubt before the sentence of life without possibility of parole can be imposed. T.C.A. § 39-13-204(a), (i).

The State did not give notice in this case because it was not seeking life without possibility of parole for this crime, and also for this reason, the trial court did not analyze the statutory aggravating factors. Defendant asserts that running his sentences consecutively was an "end run" on the statutory requirements above because it effectively resulted in a sentence of life without possibility of parole. We disagree. As pointed out by the State, this Court rejected an almost identical argument in *State v. Jawaune Massey*, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490 (Tenn. Crim. App. July 23, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014).

---

[5] The jury did not see the video footage.

We acknowledge that a trial court may impose the specific sentence of life imprisonment without the possibility of parole only upon a finding, by either the trial court in a bench trial or by the jury in a jury trial, of one or more statutory aggravating factors. *See* Tenn. Code Ann. § 39-13-204(i) (2003). This statutory limitation on the sentences that may be imposed upon a conviction of first degree murder is not, however, the equivalent of a ban on the imposition of consecutive sentences that result in effectively eliminating the possibility of parole. Rather, when the State does not seek a trial in which the potential punishments may be the death penalty or a sentence of life imprisonment without the possibility of parole, the trial court retains the statutory discretion to order the consecutive service of multiple sentences pursuant to Tennessee Code Annotated section 40-35-115.

*Id.* at *40. We agree with the decision in *Jawaune Massey*; therefore, Defendant is not entitled to relief from the trial court's imposition of consecutive sentencing in this case because there was no statutory violation.

## *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE